THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
KATHLEEN MOORE, Defendant-Appellant.

Third District    No. 79-87

Opinion filed October 15, 1980.

Robert Agostinelli and Thomas Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Rita F. Kennedy, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE SCOTT delivered the opinion of the court:

This appeal is taken from the conviction of the defendant, Kathleen Moore, for voluntary manslaughter after a jury trial. She was sentenced to a term of not less than 2½ nor more than 9 years imprisonment.

The following issues are raised on appeal: whether the evidence of the State established the defendant's sanity beyond a reasonable doubt; whether the trial court erred in failing to instruct the jury on the lesser-included offense of involuntary manslaughter; whether the trial court erred in refusing to give the instruction which the defendant tendered dealing with the reputation of the victim for being a violent person; whether the trial court properly excluded evidence of the victim's prior conviction for attempt murder; and whether the trial court erred in sentencing the defendant to a 2½- to 9-year term of imprisonment. As to all issues raised, we affirm the judgment of the trial court.

On July 19, 1977, the defendant was indicted for murder, pursuant to section 9—1(a)(2) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(a)(2)). She was charged with shooting and killing her husband, Terry Moore, on July 3, 1977. After various continuances the case was tried by a jury on May 15-18, 1978, but a mistrial was declared because the jury was hopelessly deadlocked. The defendant obtained different counsel and the case came to trial for the second time on September 19-21, 1978.

Just prior to the beginning of the second trial, the State moved *in limine* that any evidence of a prior conviction for attempt murder of Terry Moore, the victim in the present case, be excluded from the evidence at trial. The trial court granted the motion *in limine*, finding that the excluded evidence had nothing to do with the defendant's sanity at the time of the offense or her self-defense claim, as the defense counsel had argued. The incident which formed the basis of the defendant's indictment began when the defendant's cousin drove her to her estranged husband's apartment to pick him up for a family gathering. When the defendant knocked on her estranged husband's door, he answered it unclad and having an erection. He told the defendant that he had company. When she tried to push her way into the apartment, he physically attacked her. She crawled to a neighbor's apartment for assistance. She then left the building and returned to her mother's residence to change clothes and obtain a weapon to be used, in her words, "to scare Terry." By her own admission the defendant was upset at this

time. The door to her mother's residence was locked, so she climbed in through a window.

Approximately 10 minutes later she returned to her cousin's vehicle carrying a shotgun. When her cousin questioned her regarding the gun, she told him that it was unloaded. Her cousin examined the gun and determined that it was in fact unloaded. He then drove the defendant back to her estranged husband's apartment.

According to the testimony of the woman in the apartment with the defendant's husband, the following events then took place. The defendant knocked on the apartment door and when her husband opened the door and said, "What are you going to do now? Shoot me?" she replied, "Damn right, mother fucker." She then shot her husband and threatened the woman in the apartment saying, "I'm going to get sent up for one. I might as well get sent up for two." At that time the defendant did not have a weapon. The defendant then retrieved the shotgun from the floor and reloaded it, saying, "Bitch, you made me kill my husband." The woman ran into a bathroom and closed and locked the door. The defendant left the apartment complex before the police arrived and threw the shotgun in a wooded area behind the complex.

The defendant testified that she had dated Terry since she was 13 years old and that she lived with him for 7 years prior to their marriage on November 1, 1976. According to the defendant, she and Terry were separated on the night of the incident but had spent the night of July 2 together and were planning a reconciliation.

The defendant's version of the events which occurred on July 3 was basically in agreement with that given by the State's witnesses up to the point that she returned with the shotgun to the apartment building to "scare" her husband. She testified that when she knocked on the door she held the gun at her side and did not aim it at Terry. In response to his query "What are you going to do? Kill me?" she testified that she said nothing. She then stated that Terry made a jump or motion toward her and the gun "somehow went off." She did not remember pulling the trigger, loading the gun, or pointing it at the victim.

After Terry fell to the floor the defendant stated that she called for help. She denied entering the apartment and threatening the woman who was there. The defendant stated that she really did not know what happened after the shot as her mind was "blown," but she did pick up the gun, which had fallen or been thrown to the floor, reload it, run from the apartment building, and drop the gun as she exited.

Two occupants of the apartment building occupied by the victim corroborated the defendant's testimony regarding the beating she received when she first attempted to enter the apartment. They stated that

following the shooting the defendant ran into their apartment in an hysterical state, saying that she had killed her husband and that an ambulance should be called. She then left the building.

The defendant and several defense witnesses testified to Terry's bad reputation and violence and the defendant's reputation for being a peaceful citizen. Many of these same witnesses testified that the defendant and Terry argued often, always at his instigation, and that he beat the defendant more than one thousand times during the relationship, sometimes laughing during the beatings.

The defendant and some members of her family also testified to her mental condition. The defendant fell off a swing at the age of four or five and was unconscious for a considerable period of time. Doctors prescribed phenobarbital and dilantin, two drugs used to treat epilepsy. A history of severe headaches and seizures suffered by the defendant was recounted by her and other members of her family. The accounts of the seizures were not corroborated by other evidence.

Dr. Marvin Ziporyn, a specialist in forensic psychiatry, was the final defense witness. He stated that in his opinion the defendant was unable to conform her conduct to the law at the time of the offense due to a cerebral paroxysm she suffered at the time of the shooting. Dr. Ziporyn characterized the seizure as a manifestation of epilepsy classified as a psychomotor equivalent in which the person suffering the seizure would act out behavior, usually of uncontrollable violence. In Dr. Ziporyn's opinion the defendant suffers from a nonpsychotic organic brain syndrome. A person with such a condition would show such symptoms as accentuation and exaggeration of basic personality traits with a tendency to overreact in certain situations. Such a person would have poor insight and judgment, difficulty tolerating frustration, and a marked weakening of impulse control.

Dr. Ziporyn based his opinion on an electroencephalogram (E.E.G.) and a three-part examination of the defendant. The examination consisted of his observation of the defendant, obtaining the defendant's history, and a formal mental examination.

On rebuttal, the State presented the testimony of Dr. Douglas Bey, a psychiatrist in private practice in Normal, and Dr. Taylor, a clinical psychologist and associate of Dr. Bey. Dr. Bey found that the defendant had no psychiatric illness or organic brain disease which played a role in the shooting. Dr. Bey found no organic brain syndrome to be present and stated that in his opinion epilepsy played no role in the incident. Dr. Bey noted that the defendant's seizures were not documented and that the E.E.G. which he ordered was normal. Dr. Bey concluded that no mental disease or defect prevented the defendant from adhering to the law on July 3, 1977.

Dr. Taylor tested the defendant for organic deficit at the request of Dr. Bey and concluded that there was no evidence of gross organic impairment or gross psychosis or pathology suggesting that the defendant was out of contact with reality.

At the close of the evidence and after first arguments, the trial court instructed the jury on the offenses of murder and voluntary manslaughter. Included were instructions relating to justifiable use of force and to insanity. The defendant tendered instructions on the offense of involuntary manslaughter, but these instructions were refused.

The defendant first contends that the State failed to meet its burden of proving her sane beyond a reasonable doubt where she presented some evidence creating a reasonable doubt as to her sanity at the time of the offense. The affirmative defense of insanity is defined in section 6—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 6—2(a)) as follows:

"A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

Every person is initially presumed to be sane in the course of his conduct, whether criminal or not. The defendant may overcome this presumption by presenting some evidence which creates a reasonable doubt of his sanity. Once the defendant has rebutted the presumption of sanity, the burden devolves upon the State to prove the defendant's sanity at the time of the offense beyond a reasonable doubt. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114.) Whether the State has met its burden is a question for the trier of fact. *People v. Jackson* (1976), 42 Ill. App. 3d 919, 356 N.E.2d 979.

In weighing the question of the defendant's sanity the trier of fact must consider the totality of the evidence, weighing the testimony and determining the credibility of the witnesses, both lay and expert, without being required by law to accept the opinions of psychiatrists concerning the defendant's sanity. (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114; *People v. Goodwin* (1980), 83 Ill. App. 3d 203, 403 N.E.2d 1051; *People v. Sims* (1976), 35 Ill. App. 3d 401, 342 N.E.2d 256.) Furthermore, since a defendant may fabricate during an interview with a psychiatrist, courts have held that the trier of fact can properly reject a psychiatrist's opinion when it is based on an interview with the defendant. (*People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319.) The determination of the trier of fact regarding the defendant's sanity will not be disturbed unless it is so palpably erroneous as to indicate that it was based on prejudice or passion. *People v. Kuhn* (1979), 68 Ill. App. 3d 59,

385 N.E.2d 388; *People v. Rennert* (1977), 49 Ill. App. 3d 485, 364 N.E.2d 506.

■■ In the instant case the trier of fact weighed the expert testimony of Dr. Ziporyn, in whose opinion the defendant suffers from a nonpsychotic organic brain syndrome which would have rendered her unable to conform her conduct to the law at the time of the offense, and that of Dr. Bey and Dr. Taylor, who found no evidence of organic impairment or pathology which would have prevented the defendant from adhering to the law. In addition, the jury heard uncorroborated testimony from the defendant and members of her family concerning the defendant's purported history of epileptic seizures. Based upon the evidence presented we cannot say that the jury's determination that the defendant was sane at the time of the offense is against the manifest weight of the evidence.

■■ The defendant next argues that the trial court committed reversible error in failing to instruct the jury on the lesser-included offense of involuntary manslaughter. In her original brief the defendant contends that the trial court erred in refusing to give her proffered instructions on involuntary manslaughter. However, as pointed out in the State's brief, according to an order of stipulation of fact filed in this court on May 15, 1980, the involuntary manslaughter instructions were actually tendered by the defense at the defendant's first trial, not the second trial where the defendant was convicted. Upon this basis the State argues that the defendant has waived any error in the instructions. We agree that the defendant has waived the issue of the trial court's refusal to instruct on involuntary manslaughter.

The defendant evidently concedes the waiver issue, because in her reply brief she takes the position that the trial court's refusal to instruct the jury on involuntary manslaughter *sua sponte* should be reviewed under the plain-error doctrine. As support for her position the defendant cites to *People v. Joyner* (1972), 50 Ill. 2d 302, 278 N.E.2d 756, for the proposition that plain error is at issue here because the jury was not instructed on a lesser-included offense. While it is true that in a homicide case, where the evidence if believed by the jury could reduce the crime to voluntary or involuntary manslaughter, the failure to give instructions defining those crimes constitutes reversible error, we do not believe that the evidence in the case at bar could possibly justify a jury verdict of involuntary manslaughter.

■■■ Involuntary manslaughter is available only where there is evidence of recklessness by the defendant. (See *People v. Robertson* (1976), 43 Ill. App. 3d 143, 356 N.E.2d 1180.) Contrary to the defendant's assertions, the evidence in the present case does not support a finding of involuntary manslaughter. The defendant's three defense theories, namely self-defense, insanity, and an accidental shooting, belie the reckless disregard for one's

actions necessary to sustain an involuntary manslaughter conviction. In addition the time lapse which occurred between the time the defendant first encountered her husband under admittedly aggravating circumstances and the time she returned to the apartment with a gun negates the possibility that the defendant acted recklessly or unintentionally. For these reasons the trial court properly determined that an involuntary manslaughter instruction should not have been given *sua sponte*.

The defendant's third contention is that the trial court erred in refusing to give the jury instruction which the defendant tendered dealing with the reputation of the victim for being a violent person. The State argues that the defendant has waived this issue by her failure to properly abstract the jury instructions. However, we note that the defendant's reply brief contains a complete set of the instructions tendered by her at her second trial, from which this appeal is taken. For this reason we will consider the merits of the defendant's argument.

The tendered instruction concerning the victim's reputation reads as follows:

"The defendant has introduced evidence of the reputation of Terry Moore for being a violent person. This evidence may be sufficient when considered with other evidence in the case to raise a reasonable doubt of the defendant's guilt. However, if from all the evidence in the case you are satisfied beyond a reasonable doubt of the defendant's guilt, then it is your duty to find her guilty, even though Terry Moore may have had a bad reputation for being a violent person."

■■ Where, as in the present case, the defendant relies upon a theory of self-defense, evidence of the victim's reputation is properly admitted to establish the circumstances confronting the defendant, the extent of the apparent danger to the defendant, and the motive by which the defendant was influenced. (*People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841.) However, in the present case the instruction tendered by the defendant misstates the applicable law because it does not characterize the evidence relating to the victim's reputation for violence as circumstantial evidence relevant to the defendant's affirmative defense of self-defense. The tendered instruction suggests that it may be proper to kill someone who has a reputation for violence. Clearly, this statement is erroneous and misleading.

■■ Whenever a party tenders an instruction which is not found in IPI Criminal, as is the case here, the trial court has discretion to determine whether the instruction should be given. (Ill. Rev. Stat. 1979, ch. 110A, par. 451(a); *People v. Henricks* (1975), 32 Ill. App. 3d 49, 335 N.E.2d 521.) We find no abuse of the court's discretion in refusing the misleading instruction tendered by the defendant, particularly when the jury was

given standard IPI instructions on self-defense and circumstantial evidence and was instructed that the State must prove the defendant was not justified in using the force that she used.

The fourth issue raised on appeal is whether the trial court erred in excluding evidence of the victim's prior conviction for attempt murder. The defendant contends that such evidence is relevant to her state of mind at the time of the offense as it relates to her theories of self-defense and insanity.

■■ It is well established that where a defendant relies on a theory of self-defense and presents some evidence from which the jury might find the victim to be the assailant, evidence of the victim's violent disposition and prior threats or misconduct directed toward the defendant is admissible. (*People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841.) However, individual acts of violence towards someone other than the defendant are not admissible. *People v. Allen* (1976), 35 Ill. App. 3d 342, 341 N.E.2d 431.

■■ Because the defendant's state of mind at the time of the offense is critical to her self-defense and insanity theories, it is clearly permissible to introduce evidence revealing the defendant's perception of the danger, and specific facts bearing on this perception should be admitted. (*People v. Adams* (1979), 71 Ill. App. 3d 70, 388 N.E.2d 1326.) These facts may include evidence of the victim's prior conviction for murder as well as evidence of other violent behavior on the part of the victim. (See *People v. Ortiz* (1978), 65 Ill. App. 3d 525, 382 N.E.2d 303; *People v. Singleton* (1976), 41 Ill. App. 665, 354 N.E.2d 464.) We find, therefore, that in the case at bar the trial court erred in refusing to admit evidence of the victim's prior conviction for attempt murder, because such knowledge may have affected the defendant's state of mind at the time of the offense.

■■ Having found error in the court's refusal to admit evidence of the victim's attempt murder conviction, we conclude that the error was harmless since it did not deny the defendant her right to fully develop her defenses. Ample evidence of the defendant's tumultuous relationship with the decedent was presented. The defendant testified that the victim beat her on numerous occasions, testimony which was corroborated by other witnesses. Also introduced was testimony concerning the victim's attack upon the defendant approximately 45 minutes prior to the shooting. Thus, ample evidence of the victim's violent nature and of his attacks upon the defendant was presented. For this reason the jury was fully apprised of the defendant's knowledge of the deceased's violent disposition, and the exclusion of the evidence relating to the victim's attempt murder conviction was harmless error.

■■ The final argument raised by the defendant is that the trial court's

imposition of a 2½- to 9-year sentence upon the defendant was excessive because the trial court failed to give sufficient weight to mitigating factors. Although the defendant elected to be sentenced under the old sentencing law in effect at the time of the offense, she now contends that the new standard of review as stated in *People v. Choate* (1979), 71 Ill. App. 3d 267, 389 N.E.2d 670, should apply. We disagree and apply the abuse-of-discretion test found in *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

■■ Under the *Perruquet* abuse of discretion standard, a proper sentence must be based upon the particular circumstances of each case. Factors to be considered when imposing a sentence are the defendant's credibility, demeanor, general moral character, social environment, mentality, age, habits, and the nature of the offense. (*People v. Phillips* (1978), 58 Ill. App. 3d 109, 373 N.E.2d 1072.) We find no abuse of the trial court's discretion in the consideration of these factors and the imposition of the 2½- to 9-year sentence imposed.

For the foregoing reasons the judgment of the Circuit Court of Peoria County is affirmed.

Affirmed.

BARRY and STOUDER, JJ., concur.